RENDERED: SEPTEMBER 22, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

2016-SC-000272-TG
(2016-CA-000738-MR)

DATE 10/13/16 *KimRobinson*, DC

COMMONWEALTH OF KENTUCKY, EX REL.
ANDY BESHEAR, ATTORNEY GENERAL                    APPELLANT


ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.            HONORABLE THOMAS D. WINGATE, JUDGE
NO. 16-CI-00389


COMMONWEALTH OF KENTUCKY OFFICE OF THE
GOVERNOR, EX REL. MATTHEW BEVIN, IN HIS OFFICIAL
CAPACITY AS GOVERNOR; COMMONWEALTH OF
KENTUCKY FINANCE AND ADMINISTRATION CABINET, EX
REL. WILLIAM M. LANDRUM, IN HIS OFFICIAL CAPACITY AS
SECRETARY; COMMONWEALTH OF KENTUCKY OFFICE OF
THE STATE BUDGET DIRECTOR, EX REL. JOHN CHILTON,
IN HIS OFFICIAL CAPACITY AS STATE BUDGET DIRECTOR;
COMMONWEALTH OF KENTUCKY DEPARTMENT OF THE
TREASURY, EX REL. ALLISON BALL, IN HER OFFICIAL
CAPACITY AS TREASURER; JIM WAYNE, IN HIS OFFICIAL
CAPACITY AS STATE REPRESENTATIVE; DARRYL OWENS,
IN HIS OFFICIAL CAPACITY AS STATE REPRESENTATIVE;
MARY LOU MARZIAN, IN HER OFFICIAL CAPACITY AS STATE
REPRESENTATIVE                                    APPELLEES


AND            2016-SC-000273-TG
(2016-CA-000745-MR)


JIM WAYNE, IN HIS OFFICIAL CAPACITY AS STATE
REPRESENTATIVE; MARY LOU MARZIAN, IN HER
OFFICIAL CAPACITY AS STATE REPRESENTATIVE;
DARRYL OWENS, IN HIS OFFICIAL CAPACITY AS
STATE REPRESENTATIVE                              APPELLANTS

ON APPEAL FROM FRANKLIN CIRCUIT COURT

V.　　　　HONORABLE THOMAS D. WINGATE, JUDGE

NO. 16-CI-00389

COMMONWEALTH OF KENTUCKY OFFICE OF THE
GOVERNOR, EX REL. MATTHEW BEVIN, IN HIS OFFICIAL
CAPACITY AS GOVERNOR; COMMONWEALTH OF
KENTUCKY FINANCE AND ADMINISTRATION CABINET,
EX REL. WILLIAM M. LANDRUM, IN HIS OFFICIAL
CAPACITY AS SECRETARY; COMMONWEALTH OF
KENTUCKY OFFICE OF THE STATE BUDGET DIRECTOR,
EX REL. JOHN CHILTON, IN HIS OFFICIAL CAPACITY AS
STATE BUDGET DIRECTOR; COMMONWEALTH OF
KENTUCKY DEPARTMENT OF THE TREASURY, EX REL.
ALLISON BALL, IN HER OFFICIAL CAPACITY AS
TREASURER; COMMONWEALTH OF KENTUCKY, EX REL.
ANDY BESHEAR, ATTORNEY GENERAL　　　　　　APPELLEES

## OPINION OF THE COURT BY JUSTICE NOBLE

### REVERSING AND REMANDING

This case presents two questions. First, does the Attorney General or an individual member of the General Assembly have standing to challenge the Governor's actions as violating a statute or the constitution? The Court concludes that the Attorney General has standing but that the individual legislators in this case do not. Second, may the Governor reduce the amount of money made available to a state university under a legislative appropriation whether by revising the university's allotment under KRS 48.620(1), by withholding the allotment to the extent the university has adequate trust and agency funds under KRS 45.253(4), or by otherwise requiring a state university not to spend appropriated funds? This Court concludes that the Governor does not have that authority. The judgment of the Franklin Circuit Court is thus reversed.

2

# I. Background

Upon taking office in 2016, Governor Matt Bevin ordered an across-the-board 4.5% budget reduction for the executive branch in the fourth quarter of the 2015–2016 fiscal year. This reduction extended to the state's nine institutions of higher education, which consist of several universities and the community college system (collectively, "the Universities").

The Universities' reductions were delineated in a letter to the Secretary of the Finance and Administration Cabinet and the State Budget Director directing that their fourth-quarter allotments be reduced. The letter was dated March 31, 2016 and stated in relevant part:

> Pursuant to the authority provided to me in KRS 48.620(1), this is to certify that the allotments for the following budget units of the Executive Branch for April 1, 2016 drawn-downs [sic] by each unit under the 2015-2016 Executive Branch budget should be reduced by 4.5% of the 2015-2016 allotments:
> - Eastern Kentucky University
> - Kentucky State University
> - Morehead State University
> - Murray State University
> - Northern Kentucky University
> - University of Kentucky
> - University of Louisville
> - Western Kentucky University
> - Kentucky Community and Technical College System

On April 19, 2016, the Governor sent another letter, again to the Secretary of the Finance and Administration Cabinet and the State Budget Director. This letter recounted the previous letter's contents and then ordered "pursuant to the same statutory authority that the 2015–2016 allotments to each ... institution[] should be further revised." As to Kentucky State

3

University, the 4.5% reduction was restored. As to the other eight institutions, the letter ordered that their budget reductions be amended from 4.5% to 2%.[1]

The Attorney General filed a declaratory-judgment action against the Governor, the State Budget Director, the Secretary of the Finance and Administration Cabinet, and the State Treasurer challenging this action.[2] Three members of the House of Representatives joined as intervening plaintiffs. By agreed order, the funds at issue were placed in a separate account and were "recorded as a disbursement of FY 2016 appropriations but w[ould] not be transferred until further order of the Court at which time the funds w[ould] be disbursed to the institutions or returned to the Commonwealth's general fund."

The Governor moved to dismiss the case, claiming both that the Attorney General and the legislators lacked standing and that his actions were legal. As to the latter claim, he relied primarily on two statutes, KRS 48.620(1), which was cited in his letters, and KRS 45.253(4). He claimed that KRS 48.620(1) allowed him to reduce the "allotments" to the Universities without changing the legislative appropriations. He claimed that KRS 45.253(4) allowed him to withhold appropriations until the Universities had spent their trust and agency funds (that is, funds generated by tuition, etc.). The statutes combined, he

---

[1] Specifically, it stated: "The allotments … should be further revised so as to restore 2.5% of the 4.5% downward revisions." If read literally, this latter action would have had the effect of restoring only .1125% of the Universities' budgets (that is, 2.5% of the 4.5% reduction). But it is understood by all involved that this provision changed the overall budget reduction from 4.5% to 2%.

[2] The Governor's counsel represents the Governor, along with the State Budget Director and the Secretary of the Finance and Administration Cabinet. The Treasurer is represented by her own counsel. Their positions, however, appear to align in all respects, and reference to "the Governor" includes all of the Appellees.

4

claimed, gave him "great discretion" in whether to provide the appropriated funds.

The Attorney General disputed that KRS 48.620 gave the Governor such broad authority and argued that any such reading of the statute would violate the separation-of-powers doctrine and constitute an improper delegation of authority by the General Assembly. The Attorney General also claimed that the Governor's actions would unlawfully suspend the budget bill and that KRS 45.253(4) did not apply to the Universities, which had elected to operate under KRS Chapter 164A.

The Franklin Circuit Court concluded that the Attorney General had standing to bring the suit, but nevertheless granted summary judgment in the Governor's favor on the merits. The court concluded primarily that KRS 48.620(1) and KRS 45.253(4) delegated the authority "to address budget concerns within the executive branch." Specifically, the court concluded that these "statutes ... grant [the Governor] the authority to revise downward the Universities' allotments." The court also stated: "The Universities ... are under the Governor's control as part of the executive branch," at least in the context of the budget bill. The court concluded that the Governor's actions did not violate Kentucky's strict separation-of-powers doctrine. In this respect, the court concluded that the allotment revision was not, in fact, a reduction in the appropriation by another name, and was instead an exercise of legislatively granted power. Finally, the court concluded that there remained a check on the Governor's power, in that the judiciary could "realign[] the balance of power" if he "purports to wield divine power over another branch, or even over a division,

5

cabinet or program within the executive branch, to the point that funding levels reached constitutionally impermissibly low levels."

The Attorney General and the House members filed notices of appeal and a motion to transfer the case from the Court of Appeals to this Court. That motion was granted, and thus the appeal is before this Court.

## II. Standing

Before reaching the merits of this dispute, this Court must address the claim that the Attorney General and intervening state representatives lack standing to prosecute this action. We answer this question first because if neither the Attorney General nor the individual legislators have standing to challenge the Governor's actions, then we would be left with a non-justiciable cause of action, which would call for dismissal without addressing the merits. *See, e.g., Lawson v. Office of Att'y Gen.*, 415 S.W.3d 59, 67 (Ky. 2013) ("'Standing,' of course, in its most basic sense, refers to an integral component of the 'justiciable cause' requirement underlying the trial court's jurisdiction." (citing Ky. Const. § 112; *Rose v. Council for Better Educ.*, 790 S.W.2d 186 (Ky. 1989))).

### A. The Attorney General has standing to seek declaratory and injunctive relief to vindicate the public interest against alleged unauthorized and unconstitutional actions of the Governor.

To have standing to sue in Kentucky, the basic rule is that the person must have a "judicially recognizable interest in the subject matter of the suit." *E.g., Ashland v. Ashland FOP No. 3*, 888 S.W.2d 667, 668 (Ky. 1994). Does the

6

Attorney General have such an interest in the Governor's reductions of the Universities' budgets?

At the outset, the Attorney General argues that this Court's holding in *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152 (Ky. 2009), on the issue of the Attorney General's standing to sue other executive branch officials for declaratory and injunctive relief, should control outright without need for further analysis. In that case, we overruled our prior decision in *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610 (Ky. 1992), to the extent that it required the Attorney General to have a "personal interest" in the outcome of the case to have standing. *Thompson*, 300 S.W.3d at 172–74. In doing so, we "state[d] categorically ... that the Attorney General of the Commonwealth of Kentucky has standing to seek injunctive relief on behalf of the citizens of the Commonwealth." *Id.* at 172. That was because "the Attorney General ha[d] a sufficient personal right *in these types of cases* by virtue of the office and the duties commensurate with that high office." *Id.* at 173 (emphasis added).

That italicized language, clarifying our holding in *Thompson*, is indeed the key to unlocking the issue of the Attorney General's standing in this case. Further analysis, however, is required to determine whether *in this case* duty calls upon the Attorney General (and, thus, confers on him standing) to vindicate the public rights of the people of the Commonwealth. As we explain below, guided by history and precedent, we conclude that it does.

As we alluded in *Thompson*, the Attorney General's standing is dictated by the powers and duties of that office. Under the Kentucky Constitution, the

7

Attorney General is an elected constitutional officer whose "duties ... shall be such as prescribed by law." Ky. Const. § 91; *see also id.* § 93 ("The duties and responsibilities of the[] [constitutional] officers shall be prescribed by law ....").

The General Assembly has prescribed the Attorney General's duties and responsibilities in KRS 15.020, which in relevant part provides:

> The Attorney General is the chief law officer of the Commonwealth of Kentucky ... and shall exercise all common law duties and authority pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment. ... [H]e shall appear for the Commonwealth in all cases in the Supreme Court or Court of Appeals wherein the Commonwealth is interested, and shall also commence all actions or enter his appearance in all cases, hearings, and proceedings in and before all other courts, tribunals, or commissions in or out of the state, and attend to all litigation and legal business in or out of the state required of him by law, or in which the Commonwealth has an interest ....

Whether the Attorney General has the power to bring a given action on behalf of the people of the Commonwealth (at least where there is no statute governing the subject) turns on whether that action falls under the "common law duties and authority pertaining to the office of the Attorney General under the common law," and whether the action is one "in which the Commonwealth has an interest." KRS 15.020.

Historians, scholars, and jurists agree that clearly defining the Attorney General's common-law duties is not easily done. *See generally* Comm. on the Office of Att'y Gen., Nat'l Ass'n of Att'ys Gen., *Common Law Powers of State Attorneys General* 13–19 (Jan. 1975) (summarizing historical commentary and

8

judicial holdings on the common-law powers of the Attorney General).[3] An exhaustive definition of the Attorney General's common-law powers and duties is not required today. Instead, it suffices to analyze the parameters of that office's prerogative to seek, on behalf of the people, injunctive relief against other government actors when the Commonwealth has an interest in the case.

To begin, we reiterate: "It is unquestioned that '[a]t common law, [the Attorney General] had the power to institute, conduct and maintain suits and proceedings for the enforcement of the laws of the state, the preservation of order, and the protection of public rights.'" *Thompson*, 300 S.W.3d at 173 (alterations in original) (quoting *Commonwealth ex rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (Ky. 1974)). Significantly, the Attorney General was empowered under the common law to bring any action thought "necessary to protect the public interest." *Id.* (quoting 7 Am. Jur. 2d *Attorney General* § 6 (2009)). Indeed, the Attorney General has not only the power to bring suit when he believes the public's legal or constitutional interests are under threat, but appears to have even the duty to do so. *Cf. Wilkinson*, 828 S.W.2d at 618 (Leibson, J., dissenting) ("It is the Attorney General's responsibility to file suit to vindicate public rights, as attorney for the people of the State of Kentucky."). And, notably, this "broad grant of authority ... includes the power to act to enforce the state's statutes." *Thompson*, 300 S.W.3d at 173 (quoting 7 Am. Jur. 2d *Attorney General* § 6 (2009)).

---

[3] This publication is available at https://www.ncjrs.gov/pdffiles1/Digitization/16297NCJRS.pdf.

It is widely recognized that the Attorney General's common-law authority to represent the interests of the people derives from the broad powers that office initially possessed in representing the legal interests of the English crown. As one former Attorney General succinctly explained:

> As guardian of royal prerogative, the Attorney General of England possessed a broad range of powers. ... [W]hen state governments were organized and recognized in this country, there was no monarch in whom the government prerogatives were vested. Since the essential power of government resided and emanated from the people, the prerogatives had to be exercised on their behalf. Just as the Attorney General safeguarded royal prerogatives at common law, similarly, the official authority, an obligation to protect public rights and enforce public duties on behalf of the general public, became vested by the states in the Attorney General. And it is this obligation inherited from the common law to represent the public interest which has shaped and colored the role which the Attorney General fulfills today.

*Common Law Powers of State Attorneys General, supra,* at 2 (quoting Arthur Sills, *Proceedings of the Conference of the Nat'l Ass'n of Att'ys Gen.* 102 (1967)). Based on that widely accepted understanding of the nature of the Attorney General's inherited prerogatives, it is clear that the Attorney General has a judicially cognizable interest here, namely, in fulfilling his common-law obligation to protect public rights and interests by ensuring that our government acts legally and constitutionally.

Our predecessor court long ago recognized and adopted this view of the Attorney General's authority. Indeed, that court stated:

> [T]he source of authority of the Attorney General is the people who establish the government, and his primary obligation is to the people. ... The Attorney General, as chief law officer of this Commonwealth, charged with the duty of protecting the interest of all the people ... had such a vital interest in this litigation that he

10

> had a right to intervene at least insofar as the public issues advanced in the action were involved.

*Hancock v. Terry Elkhorn Mining Co.*, 503 S.W.2d 710, 715 (Ky. 1974); *accord Paxton*, 516 S.W.2d at 867 ("But under the democratic form of government now prevailing the people are the king, so the Attorney General's duties are to that sovereign rather than to the machinery of government." (citation omitted)). Our predecessor court made clear that KRS 15.020, "in stating at the outset that the Attorney General is 'the chief law officer of the Commonwealth,' intends that in case of a conflict of duties the Attorney General's primary obligation is to the Commonwealth, the body politic, rather than to its officers, departments, commissions, or agencies." *Paxton*, 516 S.W.2d at 868. Thus, in addition to the unquestioned "right of the Attorney General to appear and be heard in a suit brought by someone else in which the constitutionality of a statute is involved," *id.* (citing CR 24.03; KRS 418.075),[4] the Court held that the Attorney General's "constitutional, statutory and common law powers include the power to initiate a suit questioning the constitutionality of a statute," *id.*

The holding in *Paxton* thus leads to an inevitable conclusion: If the Attorney General has the power to initiate a suit questioning the constitutionality of a statute, he must also have the power to initiate a suit questioning the constitutionality or legality of an executive action. There are no grounds for treating allegedly unconstitutional executive actions differently from allegedly unconstitutional legislative actions. It is certainly in "the interest

---

[4] Not only does the Attorney General have such power, no judgment declaring a statute constitutionally infirm may be entered without his having been given notice and an opportunity to be heard on the question. KRS 418.075.

of all the people" that there be *no* unconstitutional or illegal governmental conduct. And standing must be determined at the beginning of an action, not retrospectively after the merits have been sorted out.

A plain reading of *Thompson* and *Paxton* and other authorities thus establishes that the Attorney General has standing to bring this action questioning the authority for and constitutionality of the Governor's actions.

The Governor, however, argues that the Attorney General's authority and standing to bring suit in the public interest should be limited to only those cases where there are no identifiable parties with particularized injuries (such as the Universities in this case). In support of this position, he cites *Johnson v. Commonwealth ex rel. Meredith*, 165 S.W.2d 820 (Ky. 1942), for the proposition that by enacting KRS 12.210, which authorizes state agencies to hire outside counsel, the General Assembly acted to limit the Attorney General's common-law power.

This is an overreading of *Johnson*. That case answered only whether the legislature "may withdraw [discrete common-law] powers and assign them to others or may authorize the employment of other counsel for the departments and officers of the state to perform them." *Id.* at 829. In other words, *Johnson* signed off on the General Assembly's authority to divest some of the powers of the Attorney General (i.e., serving as legal counsel to a given state entity) and invest them in another (i.e., private counsel of the entity's choosing). It did not hold, as the Governor states, that "when a state agency hires, or can hire, its own attorneys pursuant to statutory authority, the Attorney General no longer

12

has authority to unilaterally decide to act for that agency." To the contrary, *Johnson* explicitly left that question open:

> As to what extent [KRS 12.210] should be construed as affecting the supremacy of the Attorney General as the chief law officer of the Commonwealth, or to what extent it deprives him of the power and right to represent the Commonwealth as a distinct entity in litigation in which any of the departments employing counsel are involved, or in any other respect, we express no opinion, for they are questions not presented in this suit.

*Id.* at 829. Indeed, our predecessor thought it sufficient to express only its "opinion that the Act does not deprive the Attorney General of his hereditary and statutory prerogatives to the extent or degree that it can be said that he is left without substantial duties, responsibilities and rights." *Id.* KRS 12.210, as interpreted by *Johnson*, is not nearly the limitation on the Attorney General's authority as the Governor claims.

But the "supremacy of the Attorney General as the chief law officer of the Commonwealth" is squarely before us here. The simple answer is that delegating day-to-day operational powers—in this case, to the Universities' own counsel—does not preclude a need for the Attorney General to protect "the interest of all the people" when unconstitutional or unlawful conduct is claimed either by or toward those universities. The Governor's invitation to so constrain the traditional powers and duties of the Attorney General to protect the interests of the people of the Commonwealth could result in unconstitutional or unlawful conduct that would go unaddressed, against the interest of the people, if the Universities and their counsel for political, financial, or other reasons chose not to seek redress.

There is no valid justification for cutting off the "hereditary" prerogative of the Attorney General to challenge the legality and constitutionality of a state action merely because the state actor has (or could) employ other legal counsel. Indeed, the words of our predecessor in *Paxton*, by extension, ring just as true here as they did there: "We think that if the Constitution is threatened by an item of legislation [or act of the Executive], the Attorney General may rise to the defense of the Constitution by bringing a suit, and is not required to wait until someone else sues." 516 S.W.2d at 868. Likewise, the Attorney General must defend duly adopted statutory enactments that are not unconstitutional.

In fact, the soundness of this position becomes even more apparent in light of the realities (and costs) to public entities of challenging executive or legislative actions. The ongoing functions of such entities and the costs of such litigation, in money and political good will, could make a legal challenge prohibitive despite whatever disagreement they may have with a Governor's or legislature's action. Because the Attorney General is the chief law officer of the Commonwealth, he is uniquely suited to challenge the legality and constitutionality of an executive or legislative action as a check on an allegedly unauthorized exercise of power. *Cf. State ex rel. Sorensen v. State Bd. of Equalization*, 242 N.W. 609, 610 (Neb. 1932) ("[T]he Attorney General has the right, in cases where ... the interests of the public are directly concerned, to institute suit ... for their protection. The state is not left without redress in its own courts, because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer, on whom it has cast the responsibility, and to whom, therefore, it has given the right of appearing in

14

its behalf and invoking the judgment of the court on such questions of public moment."); Comment, *An Attorney General's Standing before the Supreme Court to Attack the Constitutionality of Legislation*, 26 U. Chi. L. Rev. 624, 631 (1959) ("[T]he basic constitutional principle that the judiciary is to serve as a check on the legislature would be avoided unless the Attorney General is granted standing to present the constitutional question concerning legislation which seriously jeopardizes the interests of the government as a whole.").[5]

This view of the authority of the Attorney General is in line with that taken by most of our sister jurisdictions. Indeed, the facts of a fairly recent case from South Carolina are notably similar to the facts presented here. In *State ex rel. Condon v. Hodges*, 562 S.E2d 623 (S.C. 2002), the South Carolina Supreme Court upheld the power of the Attorney General to sue to enjoin the Governor from circumventing provisions of an appropriations bill. Noting that "[t]he way in which public funds are handled and whether a violation of the separation of powers doctrine has occurred are clearly questions in which the State has an interest," *id.* at 627, the South Carolina Supreme Court held that "the Attorney General has the authority to sue the Governor when he is bringing the action in the name of the State for the purpose of asserting that a separation of powers violation has occurred," *id.* at 628. *See also id.* ("[T]he Attorney General can bring an action against the Governor when it is necessary

---

[5] For a discussion of the Attorney General's role as intra-branch check and balance on the Governor, see generally William P. Marshall, *Break Up the Presidency? Governors, State Attorneys General, and Lessons from the Divided Executive*, 115 Yale L.J. 2446, 2464–68 (2006). *See also id.* at 2449–55 (discussing, generally, common-law origins of the Office of the Attorney General and the development in most states of a "divided executive").

for the enforcement of the laws of the State, the preservation of order, and the protection of public rights.").

And courts in numerous other states have reached similar conclusions about the powers and duties of the Attorney General. *See, e.g., State ex rel. Landis v. S.H. Kress & Co.*, 155 So. 823 (Fl. 1934); *People ex rel. Scott v. Illinois Racing Bd.*, 301 N.E.2d 285 (Ill. 1973); *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554 (Me. 1973); *Jacobsen v. Parks & Rec. Comm'n*, 189 N.E.2d 199 (Mass. 1963); *Att'y Gen. v. Trustees of Boston Elevated R.R. Co.*, 67 N.E.2d 676 (Mass. 1946); *Fordice v. Bryan*, 651 So.2d 998 (Miss. 1995); *State ex rel. Douglas v. Thone*, 286 N.W.2d 249 (Neb. 1979); *State ex rel. Meyer v. Peters*, 199 N.W.2d 738 (Neb. 1972); *Hetherington v. McHale*, 311 A.2d 162 (Pa. 1973); *Yett v. Cook*, 218 S.W. 837 (Tex. 1926); *Hansen v. Barlow*, 456 P.2d 177 (Utah 1969). Of the minority of states that have ruled otherwise, their Attorneys General are typically invested with no common-law powers. *See, e.g., State v. Rankin*, 282 N.E.2d 851 (Ind. 1972); *State v. Burning Tree Club*, 481 A.2d 785 (Md. 1984). In contrast, Kentucky's Attorney General is expressly given such powers by statute.

Finally, we find particularly apt the following comments by Justice Erwin of the Florida Supreme Court:

> The Attorney General is elected by the people; he is entrusted by them with the common law power to legally represent them or some of them in matters deemed by him to affect the public interest. He has a discretionary duty under the common law rarely modified by statute to protect the public interests of any of the people who elected him.
>
> It is his discretionary duty to choose those legal matters in the area of public litigation or quasi-judicial administration in

16

which he believes it is his official duty to intervene, except in those instances when it is mandated by the legislature for him to intervene or to refrain from intervening. If he is mistaken in his legal advocacy, the courts and quasi-judicial tribunals always retain the power to rule against him and often do on the merits but this power does not affect his standing to become a party of interest in the cause or proceeding. Regardless of the effectiveness of his efforts in particular public legal situations, at least the people have the continuing satisfaction of knowing that their elected Attorney General has the right to exercise his conscientious official discretion to enter into those legal matters deemed by him to involve the public interest, even though not expressly authorized by statute. The presumption is that he will not enter strictly private litigation and a great degree of latitude must of necessity be extended to him in the exercise of his right to intervene in behalf of public interests.

*State ex rel. Shevin v. Yarborough*, 257 So.2d 891, 895 (Fla. 1972) (Erwin, J., specially concurring); *see also Mundy v. McDonald*, 185 N.W. 877, 880 (Mich. 1921) ("A broad discretion is vested in [the Attorney General] in determining what matters may, or may not, be of interest to the people generally.").

In the end, we are left with only one conclusion: the Attorney General, as chief law officer of Kentucky, has broad authority to sue for declaratory and injunctive relief against state actors, including the Governor, whose actions the Attorney General believes lack legal authority or are unconstitutional. It is that power which the Attorney General has invoked to support bringing the present action—to wit, the Attorney General seeks to enjoin the Governor's reductions of the final quarterly allotments of the Universities' 2015–2016 appropriations as exceeding the Governor's statutory and constitutional authority and violating the separation-of-powers doctrine. And we must take these allegations at face value in undertaking this standing analysis. *See City of Louisville v. Stock Yards Bank & Tr. Co.*, 843 S.W.2d 237, 328 (Ky. 1992) ("[I]t is neither the

province of the trial court nor of this Court to consider whether Appellant may be able to prove its allegations or ultimately prevail. On review, this Court will confine itself to a determination of whether the matters alleged in the complaint establish appellant's standing to bring the action or whether it is without a 'substantial interest' in the subject matter of the controversy." (citations omitted)).

The Attorney General, therefore, has standing in this case.

## B. The individual legislators do not have standing.

The intervening individual legislators claim to have standing in this case because the Governor's actions constituted a "grave infringement of their fundamental Constitutional [sic] duty to enact a biennial budget on behalf of their constituents." As the Governor describes it, they claim, in essence, that he has nullified their votes in favor of the budget bill.

We begin with the legislators' claim that it has been the practice of this Court to allow members of the General Assembly to "defend the Kentucky Constitution's 'forceful command' that the powers of the Legislative Branch be protected from invasion by the Executive Branch." This Court's practice, at least in the cases cited by the legislators, has not been nearly so broad as claimed. The legislators cite, for example, *Fletcher v. Commonwealth*, 163 S.W.3d 852 (Ky. 2005), in which many members of the General Assembly, including at least one of the members in this case, intervened to challenge gubernatorial action. The question of the legislators' standing, however, was not raised in that case. And, as this Court has held, a claimed lack of standing

is a defense that must be timely raised or else be deemed waived. *Harrison v. Leach*, 323 S.W.3d 702, 708 (Ky. 2010). Thus, while *Fletcher* may be a factual precedent for individual legislators' having intervened in a case, it is not legal precedent for their having standing to challenge the Governor's actions.

As to the legal substance of the claim, unlike the Attorney General, individual legislators do not have the role of chief legal officer for the public. The individualized role of a legislator is to represent those who have elected him or her and to participate in the decision-making that becomes the laws of the Commonwealth, including participating in the passage of budget bills. The idea that individual legislators have standing to challenge an action by the Governor—under the premise of an injury to an interest in a statute being carried out properly or the legislators' duty to vote on legislation—is simply too attenuated to create a justiciable controversy. A legislator has no individual ownership of any enacted piece of legislation and certainly can pass no legislation as an individual. Asserting that a governor's disposition of budgeted funds is an infringement on their duty to enact a budget is a non sequitur.

Nonetheless, the legislators claim that this Court has seemed in the past to take a "broad[] view of when a public official can go to court to defend the prerogatives of office." (Quoting Paul E. Salamanca, *The Constitutionality of an Executive Spending Plan*, 92 Ky. L.J. 149, 200 (2004)). In this context, Professor Salamanca discussed *Legislative Research Commission v. Brown*, 664 S.W.2d 907 (Ky. 1984), wherein the Legislative Research Commission sued "to validate its authority under certain parts of the legislation, and the original defendants, the Governor and Attorney General of Kentucky, had by counterclaim called in

19

question other parts." Salamanca, *supra*, at 200. But *Brown*, like *Fletcher*, is not support for the existence of individual-legislator standing, if only because individual legislators were not the plaintiffs in that case. More importantly, standing again was not raised in that case, at least not before this Court. *See id.* (noting that "the issue of representative standing was not addressed in the *Legislative Research Commission* court's opinion").

Obviously, legislators with a particularized, personal injury have standing to seek redress for that injury. Thus, for example, a legislator could sue for the loss of salary. *See Powell v. McCormack*, 395 U.S. 486 (1969). But that is not what we have here. Instead, the legislators are claiming some nebulous harm to their duties as legislators.

Individual legislators simply do not have a sufficient personal stake in a dispute over the execution or constitutionality of a statute, even when the claim is that another branch of government is violating the separation of powers. The United States Supreme Court reached the same conclusion when members of Congress sought to challenge the constitutionality of the Line Item Veto Act in the 1990s. *See Raines v. Byrd*, 521 U.S. 811, 830 (1997). There the Court held that "individual members of Congress do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing." *Id.* Although Article III does not dictate the contours of the law of standing before this state's courts, we generally require the same particularized, personal injury when individuals seek to bring a claim.

The individual legislators have not shown that they are representative of the entire body of the General Assembly. They "have not been authorized to represent their respective Houses ... in this action." *Id.* at 829. They are not numerous enough to demonstrate that they represent a sufficient bloc of votes to act on behalf of the whole legislature, as was the case in *Coleman v. Miller*, 307 U.S. 433 (1939). Indeed, they constitute only three of one hundred members of the House (and no members of the Senate). And, finally, they are not presiding officers of either house, whose "unique status" may give them "an enhanced capacity to maintain suit to prevent non-legislative disbursements from the treasury." Salamanca, *supra*, at 201. We need not decide today whether satisfaction of any of these conditions would suffice to give standing, however, as it is clear that the individual legislators in this case have met none of them.

Finally, it must be noted that the legislators did not actually file an original complaint in this case. Instead, they permissively intervened under Civil Rule 24.02. Whether that intervention was proper has not been argued to the Court, and we therefore leave that question for another day.

## C. Conclusion

As recounted above, the Attorney General is the state's chief legal officer and, as such, he has broad powers under statutory and common law to defend the public interest. This includes challenging conduct that he believes violates the Constitution's strict separation of powers or is otherwise unlawful. For that

reason, he has standing to bring his claims challenging the Governor's actions in this case.

The individual legislators, on the other hand, do not enjoy such a broad power of representing the full Commonwealth. To have standing, they must allege some type of particularized injury. They have not done so here. Thus, the individual legislators in this case do not have standing to challenge the Governor's actions.

We note, however, that no one has asked that the legislators be dismissed from the claim. Instead, the legislators' standing has been challenged in the context of a two-pronged attack that depends on the Attorney General also not having standing. If both lack standing, then the entire case should be dismissed. But the Governor's standing claim is framed as an *alternative* ground for affirming the Franklin Circuit Court's decision, and he acknowledges that it would require this court to conclude "that *none* of the parties have standing." (Emphasis added.) Even so, as to justiciability of this action, clearly only *one* plaintiff need have standing for the case to proceed. Since the Attorney General does have standing, this case remains a justiciable action properly before this Court. And since the Governor has asked only that the case—and not the individual parties—be dismissed, and because this is the Court of last resort in this matter, the propriety of the legislators participating in this case is moot.

### III. Does the Governor have authority to reduce the Universities' fourth-quarter allotments or otherwise require them not to spend funds?

Having addressed standing, we begin our discussion of the merits with a brief overview of the budgeting process. That process consists largely of two steps: (1) the appropriation of funds and (2) the expenditure of funds.

The first step consists primarily of the legislative appropriation process, as required by the Constitution. By default, the state treasury may not be accessed without legislative action, in the form of an appropriation. *See* Ky. Const. § 230 ("No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law ...."). As the Governor points out, an appropriation sets a ceiling on an expenditure, as it is for "a sum of money not in excess of the sum specified." KRS 48.010. Although this is correct, it is only half the story. An appropriation is also "an authorization by the General Assembly to expend a sum of money." *Id.*

The second stage of the budgeting process is the spending of money as authorized in the appropriation. Appropriated funds are not usually expended all at once. Instead, they are divided into quarterly allotments, to be used over the course of the fiscal year. KRS 48.610. The expenditure of funds itself ordinarily occurs though the issuance of warrants to the Treasurer, who then writes a check or transfers the money to whomever it is owed. KRS 45.456. But the Universities differ from most of state government in that their appropriations are made directly available to them. KRS 164A.555.

There is no question that the Governor has the authority to make budget reductions in limited circumstances. Specifically, where there is a budget

23

shortfall of 5% or less, the General Assembly has authorized the Governor (and the heads of the other branches of government) to reduce appropriations under a legislatively prescribed budget-reduction plan. KRS 48.130.

But that statute does not authorize the Governor's action in this case. There was no budget shortfall in the final quarter of the 2015–2016 fiscal year. In fact, there was a surplus. Nonetheless, the Governor sought to reduce the fourth-quarter allotments so that the funds could possibly be used for other future spending. Specifically, he hoped to buttress Kentucky's state pension systems.

The primary question in this case is whether the Governor has authority to reduce the Universities' fourth-quarter allotments in this manner and under these circumstances, or to otherwise require the Universities not to spend the funds. The Governor, as the chief executive of this Commonwealth, has only the authority and powers granted to him by the Constitution and the general law. He is the chief executive of the Commonwealth. Ky. Const. § 69. But the Governor, like everyone, is bound by the law. Indeed, the Governor has a special duty with respect to the law, as he is commanded to "take care that the laws be faithfully executed." Ky. Const. § 81.

Although questions about the constitutional separation of powers have been raised in this case, the issue is primarily whether the statutes controlling the budgeting process give the Governor the authority that he claims and whether his authority with respect to the expenditure of appropriated funds has been limited by other statutes. The Governor has identified three possible sources for his authority. Two of these are explicitly statutory—KRS 48.620(1)

24

and 45.253(4). The third is his general authority over executive branch budget units and the power to require those units not to spend appropriated funds. We address each in turn.

We also note that the Attorney General claims the Governor's actions and these statutes violate the Constitution's requirement of strict separation of powers among the branches of government. *See* Ky. Const. §§ 27–28. This Court, like most, follows "the principle that constitutional adjudication should be avoided unless it is strictly necessary for a decision in the case." *Trigg v. Commonwealth*, 460 S.W.3d 322, 330 (Ky. 2015). For that reason, the first consideration is whether the Governor has exceeded his authority under the statutes rather than whether his actions or the statutes violate the Constitution. Only if the statutes give the Governor the authority he claims, or do not otherwise limit his authority, would we need to address the constitutional question. Given our resolution of the statutory questions in this case, we need not specifically address the constitutional question.

## A. The statutory claims

Before turning to the statutes themselves, it is helpful to examine the role of judges when confronted with a statute. We did not enact the law. That is the role of the legislature. We do not execute the law. That is the role of the executive. Rather, we interpret and apply the law. As Chief Justice John Marshall stated: "Courts are the mere instruments of the law, and can will nothing. ... Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the

25

Legislature; or, in other words, to the will of the law." *Osborn v. Bank of U.S.*, 22 U.S. 738, 866 (1824). Our task, then, is to read the statutes and discern their meaning, and nothing more.

This is not always an easy task. Statutory interpretation can, at times, be complex, just as statutes can be complex. We begin, perhaps obviously, with the language of the statutes, but we often cannot end there. "Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea ...." *M'Culloch v. Maryland*, 17 U.S. 316, 414 (1819). We thus resort to an arsenal of interpretive tools, referred to variously as canons of construction or rules of interpretation, in an effort to arrive at a fair reading of the controlling statutory language.

## 1. Revising allotments under KRS 48.620.

The first question is whether reducing an allotment, without increasing other allotments by an equal amount, is a permissible revision of the allotment under KRS 48.620(1). This Court concludes that the statute does not give the Governor the authority to revise allotments in this way.

We reach this conclusion after examining the statute in context, both that within KRS 48.620(1) itself and that in other provisions of KRS Chapter 48. When the statute speaks of revising allotments, it refers to the schedule of allotments, that is, the timing of the payments throughout the fiscal year. Not only does KRS 48.620(1) refer expressly to revising the schedule, other provisions of KRS Chapter 48 and the budget bill itself require that the allotment conform to the General Assembly's appropriations. The only way for

26

this to happen is if the full amount appropriated is included in allotments over the year. Moreover, this reading is compelled by an examination of the statutory—as opposed to legislative—history of KRS Chapter 48, which shows that allotment revision has always been about revising the schedule of allotments.

### a. The language of the statute in context requires revision of allotments to refer to scheduling, not just the amount, of the allotments.

Again, we begin with the language of the statute:

> Allotments shall be made as provided by the allotment schedule, and may be revised upon the written certification of the Governor, the Chief Justice, and the Legislative Research Commission for their respective branches of government. No revisions of the allotment schedule may provide for an allotment or allotments in excess of the amount appropriated to that budget unit in a branch budget bill, or for expenditure for any other purpose than specified in a branch budget bill.

KRS 48.620(1). Although the statute does not group the words together as a single term, it is clear that we are concerned generally with the meaning of an *allotment revision.*[6]

"Allotment" is not a statutorily defined term. Its meaning, however, is fairly clear: a "share or portion of a thing that is given to someone or something." *Black's Law Dictionary* (10th ed. 2014). It is "[s]omething allotted," and "allot," in turn, means "[t]o parcel out; distribute or apportion" or "[t]o assign as a portion; allocate." *American Heritage Dictionary of the English*

---

[6] We note that KRS 48.620(1) starts with the word "allotments," which, as the Governor points out, is modified by a clause beginning with the words "may be revised." Thus, there is little question that the statute is addressed to "allotment revision," and that the Governor claims to have made such a revision.

*Language* (5th ed. 2011). In this context, it means a portion of a given appropriation.

Allotments are made on a quarterly basis, rather than the full amount of each appropriation being made available at the beginning of the fiscal year. This reflects the dual reality that expenses do not arise all at once, and that the state is rarely flush with sufficient cash to pay all those expenses at once and must instead rely on the revenue stream from taxes. In short, the quarterly allotment system is a means of coordinating revenues with expenditures.

"Revise" means "[t]o alter or edit (a text)." *Id.* An "act ... of revising" is a "revision." *Id.*

The Governor reduced the fourth-quarter allotment for the Universities by 2%. In a sense, this is a "revision"—in that it is literally an alteration of the allotment amount. The Governor claims that his action was allowed by the statute, as its only express limits are on revisions that would "provide for an allotment or allotments in excess of the amount appropriated to that budget unit in a branch budget bill, or for expenditure for any other purpose than specified in a branch budget bill." KRS 48.620(1). This, he claims, allows for revisions of allotments down—a reduction without a corresponding increase of other allotments—under the doctrine of *expressio unius* (otherwise known as the negative-implication canon). In other words, because the statute expressly includes a limit on revision, other limits are *not* included.

The Attorney General instead claims that the statute is about the timing of payments, not in the literal sense of whether the payment should be on the first or the fifteenth of a month, but in the sense of in which quarter any given

28

penny is allotted. In other words, according to the Attorney General, the power to revise an allotment is simply the power to move a penny from one quarter to another, either by advancing money to one allotment or putting it off to another. The Governor responds that the plain language of KRS 48.620(1) says nothing about the revision going to the schedule of allotments because "allotments," in the first sentence, are what "may be revised." And the allotment is the amount of money available in any given quarter.

But *allotment revision* is not the only description of revision in the statute. The second sentence of KRS 48.620(1) refers to "revisions of the allotment schedule." That sentence cannot be ignored because statutes "must be read as a whole and in context with other parts of the law." *Lewis v. Jackson Energy Co-op. Corp.*, 189 S.W.3d 87, 92 (Ky. 2005).

This is the "whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). The canon recognizes that discrete statutory language falls within a larger context, and that "[c]ontext is a primary determinant of meaning." *Id.*

And the second sentence of KRS 48.620(1) greatly affects the statute's meaning. It literally says that the revision allowed by KRS 48.620 will be to the allotment *schedule*. Given this context, *allotment revision* in the first sentence cannot be read to mean that any change constitutes a permissible revision under the statute. Just as the Governor would have us consider the second

29

sentence's prohibition on allotments exceeding appropriations, so too must we consider its use of "revisions of the allotment schedule."

With this context in mind, we conclude that revision of an "allotment" in KRS 48.620(1) refers to revising the schedule of allotments. Obviously, the statute allows a reduction of an allotment. It also allows an increase in an allotment. But when an allotment is revised up or down, there must be a corresponding revision of at least one other allotment. If the fourth-quarter allotment is reduced by 2%, then other allotments must be increased to balance the reduction, so that the sum of the quarterly allotments reflects the appropriated amount. If the revision is attempted too late, so that the other allotments cannot be revised, then revision is not allowed.[7]

This allows the allotments to comply with the requirements of KRS 48.610, which commands: "Allotments shall conform with the appropriations in the enacted branch budget bills or other appropriation provisions." This reading also allows compliance with the 2014 Executive Branch Budget Bill itself, which commands that "[a]llotments within appropriated sums for the activities and purposes contained in the enacted Executive Budget shall conform to KRS 48.610." 2014 Ky. Acts Ch. 117, Part III, § 4.[8] KRS 48.610, of

_____

[7] This understanding of the operation of allotments within appropriations is also consistent with prior decisions governing the legislative appropriation authority. *See generally James v. State University*, 114 S.W. 767 (Ky. 1908) (suggesting that the executive (there the auditor) cannot alter how (and to whom) appropriations are paid out so as to make it impractical, through exhaustion of the treasury funds, to pay some of them at the end of the budget term); *Rhea v. Newman*, 156 S.W. 154 (Ky. 1913) (requiring Treasurer to pay out all appropriated sums despite protestations that would result in a deficit).

[8] Interestingly, that same provision also commands that "[a]llotments within appropriated sums for the activities and purposes contained in the enacted Executive

30

course, requires that allotments conform to appropriations, but it also creates the "schedule of quarterly allotments of appropriations for each budget unit of the branch." KRS 48.610. Allotments can only conform to KRS 48.610 if they conform to the quarterly allotment schedule.

Only by having the full schedule of allotments comport with the appropriation can this be accomplished. Under the Governor's proposed reading of KRS 48.620(1), it cannot. Not only is KRS 48.610 an additional element of context in which KRS 48.620(1) is to be considered, it is a direct command that allotments are to conform to the appropriations made by the General Assembly. That command cannot be ignored.

This reasoning carries with it the weight of logic and considers the effect of other statutory references to "allotments." It thus offers a sounder basis for interpreting the statute than relying on *expressio unis* as applied to the appropriation-maximum qualification in KRS 48.620(1). Although that is unquestionably a legitimate principle of statutory interpretation, it should be

---

Budget ... may be revised pursuant to KRS 48.605 and this Act." 2014 Ky. Acts Ch. 117, Part III, § 4. A broad application of the *expressio unius* canon would suggest that KRS 48.620, which is not mentioned as a means by which an allotment may be revised, is not applicable to revising allotments under this bill. But that canon "must be applied with great caution, since its application depends so much on context." Scalia & Garner, *supra*, at 107. Indeed, it "properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved. Common sense often suggests when this is or is not so." *Id.* Nothing in the bill suggests that KRS 48.620 was intended not to apply to the 2014 Executive Branch Budget Bill (unlike the one passed in 2016, at least with respect to the Universities). Common sense, especially in light of how the allotment-revision statute works, as explained in this opinion, suggests that it was in effect and could be used to revise allotments. This same limit on *expressio unius*, however, shows why the Governor's reliance on it to read only an upward limit to revisions is untenable.

31

used cautiously and simply cannot control here as explained in footnote 8. The other approach discussed provides a better indication of meaning here.

### b. The meaning of *allotment revision* throughout the statute's history also requires it to be read as referring to the scheduling of allotments, and not just amounts.

The whole-text canon—as applied to the immediate context of the statute—is not the only one showing that KRS 48.620(1) allows only revision of the schedule of allotments. An examination of the statute's history[9] also demonstrates that it has always been concerned with revising the allotment schedule, rather than reducing a single allotment.

Thus we apply the fixed-meaning canon. This canon would have words "be given the meaning they had when the text was adopted." Scalia & Garner, *supra*, at 78. KRS 48.620 was adopted in 1982, and the language at issue in subsection (1) has not changed since that time. Thus, it bears the same meaning that it had at that time.

But KRS 48.620 does not exist in a vacuum, nor did it in 1982. Indeed, the statutory scheme at issue here has a long history and includes more than the provision allowing revision of allotments. Some understanding of the larger existing scheme, and how it came to be (in terms of amendments), sheds light on what *allotment revision* in KRS 48.620 meant in 1982 and now. We thus

---

[9] Here, we refer to the history of the statutory language over time in light of amendments. This is "quite separate from legislative history," Scalia & Garner, *supra*, at 256, which concerns committee reports, floor speeches, and other instances of legislative activity that are not reflected in the language of the statute. Statutory history is part of the context of the existing statutory language and is a more reliable indicator of the statute's meaning.

also apply the principle that "[s]tatutes *in pari materia* are to be interpreted together as though they were one law." Scalia & Garner, *supra*, at 252.

KRS 48.400 to .810 address general monitoring and revision of the budget during the course of the biennium. Included in this scheme is KRS 48.620 allowing the Governor to revise allotments. It also includes KRS 48.605, which allows revisions of allotments at the request of the head of a budget unit.

Also included in this scheme is express authorization for the Governor to reduce an appropriation under certain circumstances. *See* KRS 48.600. Generally speaking, this statute very narrowly and specifically grants the Governor the authority to reduce appropriations when there is an estimated or actual revenue shortfall in the general fund of 5% or less. KRS 48.600(1).

Even then, the Governor is not given free rein. Instead, he may reduce appropriations only "in accordance with the budget reduction plan included in the enacted branch budget bill," *id.*, and no reductions under the plan are permitted "in excess of the actual or projected revenue shortfall," KRS 48.600(2). And if the shortfall exceeds or is expected to exceed 5%, then action can only be taken by the General Assembly. *See* KRS 48.130(3) ("Any revenue shortfall in the general fund or road fund of greater than five percent (5%) shall require action by the General Assembly.").

On its face, the Governor's claim to broad authority under KRS 48.620(1) to change the amount of money available to the Universities when there is a budget surplus is inconsistent with his needing legislative authorization to do the same thing when there is an actual or anticipated budget shortfall under KRS 48.600. And when the statutes' history is reviewed, it is evident that they

33

are, in fact, very different powers, and that only one has been given to the Governor.

From 1982 to 2009, when faced with budget shortfalls, the Governor could not reduce appropriations.[10] Rather, he could reduce *allotments* under those circumstances. *See* KRS 48.600(1) (1982) (commanding the Governor to "make any allotment reductions for the budget units" that were necessary). He was also required to "take any steps to revise allotments for [his] respective branch[] that [we]re necessary to prevent a cash deficit." *Id.*

KRS 48.620, the allotment-revision statute, also existed at that time. Its first two sections read much as they do now:

> (1) Allotments shall be made as provided by the allotment schedule, and may be revised upon the written certification of the Governor, the Chief Justice, and the Legislative Research Commission for their respective branches of government. No revisions of the allotment schedule may provide for an allotment or allotments in excess of the amount appropriated to that budget unit in a branch budget bill, or for expenditure for any other purpose than specified in a branch budget bill and a budget memorandum provided for by KRS 48.300.
>
> (2) Revisions of allotments under this section shall be reported and reviewed as provided by subsection (4) of KRS 48.500.

KRS 48.620 (1990).[11]

But the pre-2009 version included two additional provisions:

> (3) When the actual tax receipts accruing to the general fund or road fund, as appropriate, do not permit all the allotments provided for by the schedules of allotments of all branches of

---

[10] Before 1982, these matters were handled under a different set of statutes. Those were repealed in 1982 and replaced by KRS 48.400 to .810.

[11] These provisions essentially read as they did when enacted in 1982. In 1990, they were amended slightly to add "branch budget bill" instead of "joint budget resolution." And they were later amended to delete the language "and a budget memorandum provided for by KRS 48.300" from subsection (1), and to change the cross-reference in subsection (2). Otherwise, the language has been stable.

34

government, the secretary of the Finance and Administration Cabinet shall notify all branches of government and each branch shall take appropriate action concerning allotments.

(4) This subsection shall not apply in the event of a projected or an actual deficit in tax receipts of the general or road funds as determined by KRS 48.130.

KRS 48.620 (1982).[12]

These provisions are important indicators of the meaning that *allotment revision* had when the first subsection was originally enacted. Subsection (3) required the Finance and Administration Cabinet to give notice when actual tax receipts would not permit all of the allotments, and the affected branches of government were to take appropriate action, presumably, by revising allocations as allowed under subsection (1).

On its surface, insufficient actual tax receipts sounds like a budget deficit, but subsection (4) stated that KRS 48.620 was not to apply in the event of a projected or actual deficit. Instead, upon such an occurrence, assuming the deficit was less than or equal to 5%, KRS 48.600 went into effect. Again, under the version of that statute then in effect, the Governor was allowed to make both allocation reductions and allocation revisions. But the two were unquestionably different acts, as the former was only allowed in the event of a deficit.

So when was the revision process laid out in KRS 48.620 to be implemented? "When the actual tax receipts accruing to the general fund or road fund, as appropriate, d[id] not permit all the allotments," KRS 48.620

---

[12] These provisions were not amended until repealed in 2009.

(1982), but not when there was a projected or actual deficit. What is the difference between the two scenarios? An actual deficit is when the state has literally run out of money for the year, but still has unpaid expenses. A projected deficit is when the state is projected to run out of money before the end of the year while still having projected expenses.

But tax receipts can be insufficient temporarily to pay out an allotted amount without there being an expected deficit overall for the year. Just as "the Commonwealth does not receive all its anticipated receipts on the first day of the fiscal year," Aff. of Kathleen Marshall[13] at 4, it is possible that anticipated receipts may not be received on the day they are actually expected or simply do not coincide with the timing of an allotment. That is when KRS 48.620 was set to go into effect. If, for example, actual tax receipts in the first quarter were insufficient to pay a full allotment, but the funds were expected to be available in the second quarter, then the allotments could be revised to reflect the reality of, and expectations about, the state's revenue stream. This indicates that revision of allotments, as allowed under subsection (1), was about changing the schedule of payments.

Moreover, the version of KRS 48.600 then in effect demonstrates that a *reduction* of an allotment, which was allowed when there was a deficit, was different from a *revision* of an allotment. Revision of an allotment was also allowed when there was a deficit, but short of a deficit, only a revision was allowed, not a reduction.

---

[13] Ms. Marshall is an Analyst in the Office of the State Budget Director.

36

Under the fixed-meaning canon, the meaning of *allotment revision*, thus, must still refer to changing the schedule of the allotments. If one allotment goes down, another must go up, resulting in the same overall appropriated amount being allotted over the course of the fiscal year. Revision, in this context, differs from reduction, which means a departure down from the appropriated amount. Reduction was allowed in 1982 only when there was a deficit; the same holds true now.

The obvious response to this analysis is that subsections (3) and (4) are no longer the law, having been repealed in 2009. That, however, does not mean that subsection (1)'s meaning was changed. Unquestionably, "a significant change in language is presumed to entail a change in meaning." Scalia & Garner, *supra*, at 256. But the language in subsection (1) was not changed, even though the overall statute was amended. Indeed, that subsection (1)'s language was left intact suggests that its meaning remained fixed intentionally.

And, as explained above, as used before 2009, revision of an allotment necessarily meant something different from reducing an allotment. Thus, even if *allotment revision* were ambiguous under the current statutes, "it is fair to argue that giving an ambiguous term one meaning rather than another would cause it to make no sense as used in an earlier-enacted statute ... so that such an interpretation should be rejected." *Id.* at 323. The Governor's proposed reading of the statute would not have made sense under the pre-2009 version of the statute, even though the language in question has not been changed. For that reason, that interpretation must be rejected.

Still other changes made in 2009 suggest that *revision* of an allotment continues to mean a change in the timing of payments, rather than a *reduction*. KRS 48.600 was amended at that time so that reductions in the event of a deficit (now "revenue shortfall") were to be made to appropriations, rather than allotments. And instead of allowing these reductions to be made as "deemed necessary" by the head of the branch of government, they are now to be made "in accordance with the budget reduction plan included in the enacted branch budget bill." At the same time, subsections (3) and (4) of KRS 48.620 were repealed. These provisions were no longer necessary to clearly establish the difference in when KRS 48.600 and .620 were to be used because the reduction-revision distinction was clarified. But that was because the distinction between a revision of an allotment and what had been called a reduction of an allotment (now a reduction of an appropriation) had been clarified.

In light of this statutory history, it is evident that KRS 48.620(1) has always been addressed to revising the schedule of allotments. Nothing in the amendments in 2009 suggests that this language means something different now.

## 2. Withholding allotments when there are trust and agency funds under KRS 45.253(4).

As an alternative, the Governor claims that his action, in substance, was permitted by KRS 45.253(4), which allows the Secretary of the Finance and Administration Cabinet to "withhold allotment of general fund appropriations to the extent trust and agency funds are available." As noted above, the

38

Governor presented evidence that the Universities had available adequate trust and agency funds to cover the reductions he made, and thus there would be nothing unlawful about the Secretary withholding allotment of 2% of the fourth quarter's general-fund appropriations.

The problem with the Governor's position, however, is that the financial administration of state universities is governed by KRS 164A.555 to .630.[14] And KRS 164A.630(2) states specifically that "[a]ny other provisions of KRS Chapter[] ... 45 ... to the contrary notwithstanding, KRS 164A.555 to 164A.630 shall govern the financial management of higher education."[15] Thus, to the extent that KRS Chapter 45, including 45.253(4), is inconsistent with KRS 164A.555 to .630, the latter set of provisions controls.

The Governor argues that there is no inconsistency and, that to the extent there *could* be one, any conflict should be resolved in favor of reading these statutes in harmony if possible. It is unquestionable "that where two statutes are in apparent conflict, their inconsistencies should be reconciled if possible." *Commonwealth v. Martin*, 777 S.W.2d 236, 238 (Ky. App. 1989); *see also* Scalia & Garner, *supra,* at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). The question is whether the statutes can be read in harmony.

---

[14] Technically speaking, these provisions require the Universities to have opted into their governance. KRS 164A.560. The Universities all appear to have done so.

[15] That statute includes an exception not applicable to this case: "with the exception of KRS 45.990 and 45A.990 having to do with penalties which shall be applicable to violations of KRS 164A.555 to 164A.630."

The Governor notes that the financial-management provisions of Chapter 164A are about the internal financial management of the Universities, whereas KRS 45.253(4) applies to the Finance and Administration Cabinet. Because they govern different entities, goes the argument, they cannot be in conflict. This is largely correct, as most provisions of KRS 164A.555 to .630 are directed to the internal financial management of the Universities.

But not every provision is. Indeed, the very first provision, KRS 164A.555, is instead directed at the Finance and Administration Cabinet. It states:

> The secretary of the Finance and Administration Cabinet shall issue warrants authorizing the Treasurer of the Commonwealth of Kentucky to pay to the treasurer of each institution any amounts due by virtue of the state appropriations for that institution, or transfer the amount due electronically if electronic transfer is authorized by statute. The transfer of funds shall be handled in a manner to assure a zero (0) balance in the general fund account at the university.

KRS 164A.555. This statute specifically directs the secretary to bypass the ordinary process of issuing warrants to the Treasurer to pay expenses on behalf of a government body and to instead issue warrants to the Treasurer to pay "any amounts due" directly to the Universities.

The Governor argues that this statute accomplishes only one thing: it allows the Universities to pay their own bills, rather than relying on the Finance and Administration Cabinet and the Treasurer as each bill comes due. It certainly has that effect, but that is not all the statute does. It is a direct command to the Secretary of Finance and Administration Cabinet to pay "any amounts due by virtue of the state appropriations for that institution."

40

KRS 164A.555. The "amounts due by virtue of the state appropriations" is exactly that: the amount appropriated—the *full* amount.

Again, the Governor disputes that this requires the full amount, and argues that "any amounts due" simply "refers to any amount up to the appropriated amount." He notes again his argument that an appropriation is only a ceiling and that not every penny must be spent. Again, this is true but is not the full story. An appropriation is also an authorization for the expenditure of funds.

More importantly, KRS 164A.555 is simply not ambiguous. To the extent an amount is authorized by an appropriation, KRS 164A.555 recognizes that amount is "due" to the Universities. Although the word "due" has many uses and meanings, its relevant meaning here—in the context of an amount of money—is "[p]ayable immediately or on demand" or "[o]wed as a debt; owing." *American Heritage Dictionary of the English Language* (5th ed. 2011). Indeed, the usage example offered for this latter definition is "the amount still due." *Id.* Although the first use is more common in modern English, *see* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 300 (3d ed. 2011), both meanings demonstrate that whatever amounts are "due" under the appropriations are amounts to which the Universities are entitled, whether immediately or as a debt. Either way, the statute orders the Secretary of Finance and Administration to issue warrants for those amounts. ("Due" is limited here to some extent by the statutes requiring quarterly allotments; in other words, the full amount does not become due at the beginning of the fiscal year.)

41

And the word "any" further confirms this understanding that the full amount must be paid. Although it has multiple senses, the word as used here means "every" or "all." *See American Heritage Dictionary of the English Language* (5th ed. 2011) ("Every: *Any dog likes meat.*"); Bryan A. Garner, *Garner's Modern English Usage* 57 (4th ed. 2016) (noting that "any" has six uses as an adjective but that "[i]n affirmative sentences, it means 'every' or 'all' ... <you are required to produce any documents relating to the issue>"). Thus, the statute cannot mean that an amount less than the full appropriation can be paid to the Universities. Instead, a warrant for all of the amount or every amount due must be issued by the Secretary. Any action less would not comport with the directive of KRS 164A.555.[16]

And that the full amount is due is further confirmed by the budget bill itself. Specifically, the 2014 Executive Branch Budget Bill commanded "that the Executive Branch shall carry out all appropriations and budgetary language provisions as contained in the State/Executive Budget." 2014 Ky. Acts Ch. 117, Part III, § 27. The only way to do so was to comply with KRS 164A.555.

In short, the conflict between KRS 164A.555 and 45.253(4) is inescapable. The two cannot be read together without ignoring the plain meaning of the language in KRS 164A.555. Because KRS 164A.630(2)

---

[16] The proof in this case included an affidavit from Kathleen Marshall, an analyst in the Office of the State Budget Director, stating that the Universities do not actually draw their full allotment at the beginning of each quarter, though it is ordinarily available to them. Our reading of the statute does not render this practice unlawful. As long as the appropriated funds are made available, the statute is complied with.

commands that the provisions of KRS Chapter 164A control over KRS Chapter 45 if there is a conflict, KRS 164A.555 must control. Thus, the Finance and Administration Cabinet cannot withhold the Universities' allotments even if they have sufficient trust and agency funds to cover their expenses.

Any concerns the Governor raises about an appropriation not requiring the expenditure of the full amount—of every penny—are alleviated by the fact that any funds paid to the Universities on the Secretary's warrant but not spent will lapse back to the general fund. *See* KRS 164A.565(2) (" Any uncommitted state general funds remaining after the close of business on the last day of the fiscal year shall lapse and be returned to the Treasury of the Commonwealth.").[17] Thus, it is evident that the Universities, like any other state agency with discretion in how it spends money, are not required to expend every penny appropriated to them. Nor is that money lost to the state, as it is returned if not spent.

## B. The Governor's authority to decline to spend appropriated funds is statutorily limited with respect to the Universities.

The Governor has not explicitly claimed the inherent authority to require the Universities not to spend their funds. But this understanding of executive power is implicit in his argument. Indeed, he emphasizes in his brief that while the power of the purse belongs to the legislature, "administering an appropriation and spending money is an executive function." And he claims that he has acted within that realm, having "taken the purse of money provided

---

[17] Funds appropriated for capital construction are excluded from this lapse. KRS 164A.565(6).

43

by the legislature and h[aving] reasonably decided that the legislature's will can be satisfied without spending all of the money in the purse." We recognize that the Governor has disclaimed the existence of "unfettered power to withhold appropriated money and reduce spending," and instead claimed authority for his actions under the statutes addressed above. At the same time, however, he claims, under the guise of laying out a limiting principle on his authority, that he "may direct budget units to spend less than the full amount of an appropriation so long as 'he has determined that such a decision will not compromise the achievement of underlying legislative purposes and goals.'" (Quoting *Opinion of the Justices to the Senate*, 376 N.E.2d 1217, 1223 (Mass. 1978)). The acknowledgement of this limiting principle, however, contains in it a suggestion of an authority that does not exist with respect to the Universities.

The existence and breadth of such an authority generally is not before us. Thus we do not address whether the Governor's exercise of such authority in other areas of the executive budget might create a constitutional challenge as the Attorney General has claimed. Here, the statutory language is clear that the legislature has not given the Governor control over the Universities' appropriated funds regardless of whether such authority exists in regard to other budget units.

In suggesting that reducing the Universities' allotments has been essentially a decision not to spend the money, the Governor relies heavily on the notion that an appropriation is a ceiling on spending. There is little question that an appropriation does not mandate the expenditure of all the funds authorized (unless the appropriation says otherwise). Indeed, the budget

44

bill at issue in this case itself notes that "[t]here is appropriated ... the following discrete sums, or so much thereof as may be necessary." 2014 Ky. Acts Ch. 117, Part I, § (1).

So the question is simple: May the Governor order the Universities not to spend their funds? Or, as the trial court suggested, are "[t]he Universities ... under the Governor's control as part of the executive branch"? Although the Universities are state agencies and are attached to the executive branch for budgetary purposes, they are not part of the executive branch in the same sense as the program cabinets and boards directly under the Governor's control.

Unlike those cabinets and boards, the Universities' boards are separate "bod[ies] corporate, with the usual corporate powers."[18] KRS 164.350; *see also* KRS 164.460 (same for the University of Kentucky); KRS 164.830(1) (same for the University of Louisville). They are expressly excluded from being part of the Department of Education. KRS 164.285.[19] In some ways, they are akin to municipal or public corporations, having a separate existence from the main body of government, although retaining many of the government's characteristics, such as immunity from suit.

---

[18] Indeed, the Governor's counsel emphasized at oral argument, albeit in discussing the standing question, that the Universities were separate corporations from the rest of state government.

[19] That statute went so far as to repeal any statute suggesting that the Universities are part of the Department of Education: "KRS 156.010 and 64.640 and any other statute, to the extent that they provide that the University of Kentucky, Eastern Kentucky State University, Western Kentucky State University, Murray State University, and Morehead State University shall be included in the Department of Education and constitute a division thereof, are hereby repealed." KRS 164.285.

The Universities' boards have close to plenary power over the operation of their respective institutions. For example, they have exclusive control over appointments, qualifications, and salaries of faculty and employees. KRS 164.365(1); KRS 164.220 (UK); KRS 164.830 (U of L).

And the Universities are all generally given authority to receive and spend money from all sources. The Universities other than the University of Kentucky and the University of Louisville are given the power to receive and spend money under KRS 164.350(1): "Each board may: (a) Receive grants of money and expend the same for the use and benefit of the university or college ...." If they opt to proceed under KRS 165.555 to .630, which the Universities have done, they may "receive, deposit, collect, retain, invest, disburse, and account for all funds received or due from any source including, but not limited to, state and federal appropriations." KRS 164A.560(2)(a). This grant of authority is even more explicit with respect to the boards of the University of Kentucky and University of Louisville, both of which are expressly given the authority to receive and spend appropriations and allotments. *See* KRS 164.160 (giving UK board power to "receive, hold and administer ... all revenues from ... appropriations, [and] allotments"); KRS 164.830(1)(d) (stating powers of U of L board include "receipt, retention, and administration ... [of] all revenues accruing from ... appropriations, [and] allotments").

There are, of course, some limits on how the boards operate. For example, certain expenditures must be approved by the Finance and Administration Cabinet or the Council on Postsecondary Education. *See* KRS 164A.575 (requiring cabinet approval for real property purchases); KRS

164.020(11)(a) (giving council power to approve certain capital construction projects). But that does not otherwise bring the financial decision-making—the choice whether to spend funds—back within the purview of the Governor.

The Governor also has some say with respect to the Universities' boards. For example, he gets to appoint most of the members of the boards. *See* KRS 164.131(1)(e) (UK); KRS 164.821(1) (U of L); KRS 164.321(1)(a) (other universities). And he may remove members for cause. *See* KRS 63.080(2); KRS 164.131(1)(d) (UK); KRS 164.821(1)(b) (U of L); KRS 164.321(10) (other universities); KRS 164.325 (specifically applying 63.080(2) to boards of regents).

These provisions, however, do not undermine the university boards' fundamental independence. A large portion of this independence is financial self-control. The authority over the expenditure of funds appropriated to the Universities has been statutorily lodged with independent boards that head these institutions. Those boards may decline to spend funds appropriated to them, in which case the funds will lapse.[20] But by giving that authority to the boards, the General Assembly has necessarily deprived the Governor of it. We thus conclude that the Governor cannot order the boards of the Universities not to spend funds appropriated to them.

The Governor's authority with respect to the boards differs fundamentally from his authority with respect to those state entities and

---

[20] Like the rest of state government, the Universities are subject to a lapse provision if they do no spend state funds before the end of the fiscal year. *See* KRS 164A.565(2) (providing for lapse of "uncommitted state general funds remaining after the close of business on the last day of the fiscal year").

47

employees that answer to him, such as the program cabinets and secretaries who head those cabinets. In this sense, the Universities are much more like private entities. And their authority over spending their money is largely independent of the executive branch.

Indeed, this is likely why the Universities, unlike other government entities, are given their own money to be held in their own accounts, rather than relying on the Finance and Administration Cabinet's submitting warrants to the Treasurer, who would then write checks to third parties owed money by the Universities:

> The secretary of the Finance and Administration Cabinet shall issue warrants authorizing the Treasurer of the Commonwealth of Kentucky to pay to the treasurer of each institution any amounts due by virtue of the state appropriations for that institution, or transfer the amount due electronically if electronic transfer is authorized by statute. The transfer of funds shall be handled in a manner to assure a zero (0) balance in the general fund account at the university.

KRS 164A.555.

This illustrates why the Governor's suggestion that he has simply stopped the money from being spent mischaracterizes what he has actually done. Rather than ordering the Universities not to spend money, which he cannot do, and thereby allowing those funds to lapse back to the General Fund at the end of the fiscal year, he has instead effectively intercepted the funds before they became available to the Universities. By reducing the final quarterly allotment, the Governor has essentially frustrated the overall appropriation by the General Assembly. Money that the General Assembly made available to the Universities through its appropriations was made unavailable by the

48

Governor's actions. Simply put, there is a difference between exercising an authority not to spend money once it has been made available and preventing the money from being made available to the entity that has the power to decide not to spend it.

Again, this is not to say that every penny appropriated must be spent. As the Governor points out, such a legal requirement would be fiscally irresponsible. And the budget bill itself recognizes this by authorizing the spending of appropriations "or so much thereof as may be necessary." But the Governor does not have the power to make that decision for the Universities.

And if the Governor does not have discretion over whether to spend the money because the funds were appropriated for an entity over which he does not have control, then the transfer of funds "is a ministerial, mechanical, non-discretionary act." *People ex rel. Bakalis v. Weinberger*, 368 F. Supp. 721, 726 (N.D. Ill. 1973). Indeed, KRS 164A.555, discussed above, further demonstrates how this is a ministerial act: it commands the secretary of the Finance and Administration Cabinet to issue warrants for the payment of the Universities' "any amounts due by virtue of the state appropriations for that institution." That statute also necessarily limits the Governor's authority, as he cannot legally compel the secretary to act contrary to law. And, again, the budget bill itself commanded "that the Executive Branch shall carry out all appropriations and budgetary language provisions as contained in the State/Executive Budget." 2014 Ky. Acts Ch. 117, Part III, § 27. This limit makes the Governor's conduct with respect to entities over which he has no control purely ministerial.

49

Consequently, we need not address the constitutionality of the actions the Governor claims he is entitled to make, because our statutory analysis makes it clear that he does not have the legal authority to take such actions.

## IV. Conclusion

The Governor's reduction of the allotments of the Universities in this case exceeded his statutory authority to revise allotments under KRS 48.620(1) and his authority to withhold allotments under KRS 45.253(4). Whatever authority he might otherwise have to require a budget unit not to spend appropriated funds does not extend to the Universities, which the legislature has made independent bodies politic with control over their own expenditures. We therefore do not reach the question of whether his actions were constitutional, as the statutes do not give him the authority to act as he proposed. For these reasons, the Franklin Circuit Court's order upholding the Governor's actions is reversed, and this matter is remanded for further proceedings consistent with this opinion.

All sitting. Minton, C.J.; Cunningham, Hughes, and Keller, JJ., concur. Venters, J., dissents by separate opinion. Wright, J., dissents by separate opinion in which Venters, J., joins.

VENTERS, J., DISSENTING: I respectfully disagree with the majority's conclusion that the Attorney General has standing to assert the claim his office presents in the absence of affected universities. The majority has no express constitutional or direct statutory authority to support its conclusion that the Attorney General has standing to sue the chief executive to enjoin an executive action, and so it bases its opinion on the vague notion that such authority was

50

available to attorneys general at common law. As explained below, that notion is flat-out wrong. No attorney general in the entire common law history *ever* had that authority, and neither the majority opinion nor the Attorney General himself cites even a single common law precedent for such power.

I agree with the majority's conclusion that Representatives Wayne, Owens, and Marzian have no standing, either personally or as proxies for the legislative branch of government, to assert claims contesting the Governor's executive order to reduce allotments to state-supported universities for the final quarter of the 2015-2016 fiscal year.[21] I join Justice Wright's dissent and I agree with his reasoning that the affected state universities are the proper parties to bring the claim. Since the only affected parties with a claim to assert have reached an accommodation with the Governor and chosen not to litigate, there is no justiciable controversy. The only correct resolution is dismissal of the case without addressing the merits. *Lawson v. Office of Attorney General*, 415 S.W.3d 59, 67 (Ky. 2013); *Rose v. Council for Better Education*, 790 S.W.2d 186 (Ky. 1989); Ky. Const. § 112.

The doctrines of standing and justiciability prevent interlopers from asserting claims that legally belong to others. The doctrines exists because we learned long ago in the common law tradition that it is unwise for the courts to

---

[21] The General Assembly as a body politic in its own right needs no standing because it need not resort to the courts for help in fending off an encroachment by the Governor upon the legislature's rightful powers. The legislative branch has a full constitutional quiver of legislative arrows with which to defeat any executive intrusion into the legislative prerogative and to cure any distortion of the legislature's will caused by such an intrusion. If, rather than using its own constitutional authority to reassert its legislative prerogative, the General Assembly also sought a judicially-imposed remedy, its standing would also have to be properly established.

litigate claims asserted by those who have no personal interest at stake. That is especially true when those who actually have a cognizable claim have declined to do so. To have standing to sue, "[a] plaintiff must have a real, direct, present and substantial right or interest in the subject matter of the controversy." *Housing Authority of Louisville v. Service Employees International Union, Local 557,* 885 S.W.2d 692, 695 (Ky. 1994). "In order to have standing to sue, a plaintiff need only have a real and substantial interest in the subject matter of the litigation, as opposed to a mere expectancy." *Rose,* 790 S.W.2d at 202. To restate the standing concept in more colloquial terms: to have standing to assert a claim in court, "you have to have skin in the game."

Standing to invoke the authority of the courts for redress of an injury is acquired in two, and only two, ways. First, as noted above, one who suffers a direct and immediate judicially-cognizable injury or has an interest deserving of legal protection has standing. Second, the legislature may by statute confer standing upon an entity even if it lacks a direct and immediate injury. *See Tax Ease Lien Investments 1, LLC v. Commonwealth Bank & Trust,* 384 S.W.3d 141, 143 (Ky. 2012) (quoting *City of Ashland v. Ashland F.O.P. # 3, Inc.,* 888 S.W.2d 667, 668 (Ky. 1994)); *In re Pappas Senate Committee,* 488 N.W.2d 795, 797 (Minn. 1992); and *Pennsylvania National Mutual Casualty Insurance Co. v. PWAB,* 715 A.2d 1068, 1071 (Pa. 1998).

The majority first relies upon our decision in *Commonwealth ex rel. Conway v. Thompson,* 300 S.W.3d 152 (Ky. 2009), as a source for the Attorney General's claim of standing in this matter. In *Thompson* we recognized that the attorney general has standing to seek injunctive relief on behalf of the citizens

52

to prevent the early release of inmates from prison in derogation of the judicially-imposed sentences. *Id.* at 172. Implicit in that holding was our recognition that *every single sentence affected by the planned prisoner release* arose from a case in which the Commonwealth of Kentucky was an actual party, and in many instances, was actually represented by the Office of the Attorney General. Because the objective of that litigation fell squarely and indisputably within the criminal law enforcement interest and duties of the attorney general, we concluded that Attorney General Conway had "a sufficient personal right in *these types of cases* by virtue of the office and the duties commensurate with that high office." *Id.* at 173 (emphasis added).

However, as the majority expressly acknowledges, the claim pressed by Attorney General Beshear in this litigation is *not* one of those "type of cases." The claim now asserted falls far beyond the range of the Attorney General's criminal law enforcement function. The *Thompson* case provides no support for the Attorney General's stance in this case. The majority then looks to find other law supporting the Attorney General's standing in this "type of case," and naturally begins with Section 91 of the Kentucky Constitution.

Section 91 simply provides that the attorney general has whatever "duties and responsibilities" have been "prescribed by law." The Attorney General, therefore, has no constitutionally-ordained authority that confers standing to enjoin the Governor, the Treasurer, or others from implementing the budget reduction plan for the state universities. Section 91 supports only the specific duties that have been "prescribed by law." Consequently, we look

53

to the relevant statutes enacted by the General Assembly addressing the matter.

No statute expressly provides or even obliquely suggests that the Attorney General has the authority to sue the Governor to enjoin any executive action. The only statute that is even conceivably applicable is the generic provision of KRS 15.020 that provides the Attorney General with the obligation to "exercise all common law duties and authority pertaining to the office . . . under the common law, except where modified by statutory enactment." The whole case boils down to whether "under common law" an attorney general had the authority to sue the chief executive for perceived violations of the law.

The majority readily acknowledges that "defining the Attorney General's common law duties is not easily done" and I agree. But we need not define *all* the common law duties of an attorney general to sustain Attorney General Beshear's claim of standing; rather, we need only find *one* common law duty that authorizes the suit he now asserts. I respectfully submit there are none to be found because at common law, suing the executive in the civil courts is simply *not* what attorneys general were empowered to do. *See* Nat'l Ass'n of Att'ys Gen., *State Attorneys General Powers and Responsibilities* 31 (Emily Myers, ed., 3d ed. 2013) (quoting Edwards, *The Law Offices of the Crown* 27 (1964)).

In its search to find common law precedent for the unprecedented, the majority looks to *Commonwealth of Kentucky ex rel. Hancock v. Paxton*, 516 S.W.2d 865 (Ky. 1974), which held that an attorney general has standing to

54

initiate a lawsuit to ascertain the constitutionality of a state statute.[22] But that is not the question before this Court. Attorney General Beshear does not challenge the constitutionality of any statute.

The salient fact of the *Paxton* case is that Attorney General Ed Hancock *never* challenged to any degree the legality of an executive action or executive authority despite naming as nominal parties the Department of Transportation and its commissioner. Although the *Paxton* decision does not cite a common law precedent allowing an attorney general to challenge the constitutionality of a statute, the existence of such a precedent would not be surprising given the well-documented legal battles, some of which involved actual armed warfare, waged over the centuries between the English monarch and the English parliament. In any event, *Paxton's lack* of common law precedent allowing the attorney general to challenge the constitutionality of a statute does not logically indicate the *existence* of a power at common law to sue the executive to enjoin executive action.

The *Paxton* court offers up a weak rationalization for the existence of such power and it is based upon a flawed depiction of American political theory which the majority adopts. *Paxton* opines that since the attorneys general under the common law of England served the king and therefore lacked the authority to sue the sovereign, attorneys general in the democracies of the American states in which "the people are king" serve the people, and therefore

---

[22] The challenged statutes authorized special automobile license plates for members of the General Assembly and for ham radio operators.

are not so constrained. That exercise of logic ignores the core of American constitutional theory: the people, as an exercise of their natural sovereignty, collectively acted to "institute" a government "of the people, by the people, for the people," and thus by the constitutional process they transferred their sovereignty to the state they created. The king is not sovereign in America, but neither are the people king.[23]

A more obvious contradiction to the *Paxton* theory is the undeniable fact that the people of Kentucky, the "king" as *Paxton* would have it, have NEVER directly or through their chosen representatives in the General Assembly granted the Attorney General the power he now asserts. There was no common law precedent for an attorney general suing the head of state when the state was a royal monarchy and the creation of the American states did not manufacture such precedent.[24]

Attorney General Beshear does not challenge the constitutionality of any state statute. Instead, he does what no attorney general at common law ever had the authority to do: he seeks a court order to enjoin an action of the state's chief executive, the Governor, and the state's treasurer, finance secretary, and budget director. The Attorney General deserves credit for earnestly undertaking a difficult issue that he deeply regards as important and

---

[23] After all, the king enjoyed sovereign immunity, a tribute of sovereignty now enjoyed-not by the people, but by the state.

[24] Although not strictly an application of this common law restraint, it may be recalled by many that U.S. Attorney General Elliot Richardson and Deputy Attorney General William Ruckelshaus resigned their respective offices, in part, because they expressly lack the authority to challenge the head of state, President Richard Nixon.

56

meritorious. I certainly do not suggest that executive authority should not be challenged. For a nation and a state founded upon principles of individual liberties, challenging the chief executive's authority can be a good thing. However, the question before us is not whether the Governor's action should be challenged; the question is whether the Attorney General has the authority to litigate the budget reduction issue by seeking to enjoin the Governor and the other executive officers. By the majority's analysis, the Attorney General's only viable claim to standing is that he is exercising a prerogative held by attorneys general at common law. The inconvenient fact is that no attorney general at common law ever had the authority to challenge the executive.

The majority also cites *Johnson v. Commonwealth ex rel. Meredith*, 165 S.W.2d 820 (Ky. 1942), as supporting the Attorney General's standing. Although *Johnson* lends interesting historical context to the issue at hand, it is ultimately inconsequential for two reasons. First, in *Johnson* as in *Paxton*, the Attorney General challenged the constitutionality of a statute rather than seeking to enjoin an executive action. Even more significant, however, is the fact that the Attorney General in *Johnson* had direct, conventional standing because he was directly injured by the statute being challenged. The statute he challenged expressly "divest[ed] the Attorney General of a major portion of his powers and prerogatives" so as to render the office "inoperative." *Id.* at 824. Thus, the Attorney General's standing in *Johnson* was in no way dependent upon the powers and duties of attorneys general at common law. Here, the challenged governmental action has no direct effect upon the Attorney General or his office that confers standing in the traditional sense. His only source of

57

standing is statutory, specifically KRS 15.020, which requires a common law precedent, and that precedent simply does not exist.

In *Commonwealth ex rel. Ferguson v. Gardner*, 327 S.W.2d 947, 948 (Ky. 1959), Attorney General Ferguson sought to intervene in a civil action on behalf of a charitable trust. Like the current Attorney General in this case, Attorney General Ferguson had no direct or immediate interest in the controversy to confer standing, and in the absence of direct statutory authority, he claimed the common law power to intervene "predicated on the ancient English doctrine that the King, as *parens patriae*, superintended the administration of charities and acted by the attorney general, who was his proper officer in that respect." The Court rejected that claim because "the Attorney General . . . failed to show that there was any established and recognized law of England to the effect prior to 1607" allowing his office to assert a claim in that kind of litigation. *Id.* at 949.[25]

Several available sources of legal scholarship trace the common law history of the office of attorney general and the development of its powers and duties. *See* Comm. on the Office of Att'y Gen., Nat'l Ass'n of Att'ys Gen., *Common Law Powers of State Attorneys General* (Jan. 1975); Nat'l Ass'n of Att'ys Gen., *State Attorneys General Powers and Responsibilities* (Emily Myers, ed., 3d ed. 2013). An authoritative summary can be found in *People v. Miner*, 2

---

[25] The year 1607 is determinative because Kentucky has expressly adopted all of English common law in force prior to 1607, the fourth year of the reign of James I. *See Aetna Insurance Company v. Commonwealth*, 51 S.W. 624, 627-628 (Ky. 1899); *Ray v. Sweeney*, 77 Ky. 1, 9-10 (Ky. 1878); and *Lathrop v. Commercial Bank of Scioto*, 38 Ky. 114, 121 (Ky. 1839). After 1607, Kentucky acknowledges the common law of Virginia until the 1792 establishment of Kentucky as a sovereign state.

Lans. 396 (N.Y. App. Div. 1868), which identifies the following common law

powers:

> Most, if not all, of the colonies appointed attorney-generals, and they were understood to be clothed, with nearly all the powers, of the attorney-generals of England, and as these powers have never been defined we must go back to the common law in order to ascertain them. The attorney-general had the power, and it was his duty:

> 1st. To prosecute all actions, necessary for the protection and defense of the property and revenues of the crown.

> 2d. By information, to bring certain classes of persons accused of crimes and misdemeanors to trial.

> 3d. By *scire facias*, to revoke and annul grants made by the crown improperly, or when forfeited by the grantee thereof.

> 4th. By information, to recover money or other chattels, or damages for wrongs committed on the land, or other possessions of the crown.

> 5th. By writ of quo warranto, to determine the right of him who claims or usurps any office, franchise or liberty, and to vacate the charter, or annul the existence of a corporation, for violations of its charter, or for omitting to exercise its corporate powers.

> 6th. By writ of mandamus, to compel the admission of an officer duly chosen to his office, and to compel his restoration when illegally ousted.

> 7th. By information to chancery, to enforce trusts, and to prevent public nuisances, and the abuse of trust powers.

> 8th. By proceedings in rem, to recover property to which the crown may be entitled, by forfeiture for treason, and property, for which there is no other legal owner, such as wrecks, treasure trove, &c. (3 Black. Com., 256-7, 260 to .266; id., 427 and 428; 4 id., 308, 312.)

9th. And in certain cases, by information in chancery, for the protection of the rights of lunatics, and others, who are under the protection of the crown. (Mitford's Pl., 24-30, Adams' Equity, 301-2.)

Significantly, *not* listed among these enumerated powers in *Miner* or in any other source I can find is the common law authority to challenge the actions of the chief executive. It remains abundantly clear that at common law in England and as transplanted in the American colonies, and then in the sovereign American states, attorneys general never had the duty or the power to sue the executive to enjoin executive actions, and no Kentucky statute has subsequently granted that power.

Historically, the core function of the attorney general at common law was to assert the legal interests of the government, particularly the executive head of the government, and the office was accorded the powers and duties essential to the performance of that function. Certainly, the legislature could modify that authority by enacting a statute to vest attorneys general with a plenary power to police the executive branch of government and to initiate civil litigation as their discretion warrants; but it has not chosen to do so.

*Johnson v. Commonwealth ex rel. Meredith* provides a summary of common law authority that agrees with the history outlined above.

> The office of Attorney General existed in England from an early date. Most of the American colonies established an office of the same name, and it was carried into the succeeding state governments. Legal historians are not in accord as to just what were the powers and prerogatives of the Attorney General in the mother country, but they are agreed that he was the chief law

60

officer of the Crown, managing all the king's legal affairs, attending to all suits, civil and criminal, in which he was interested, and exercising other high duties and prerogatives, some of which were quite foreign to the legal.

165 S.W.2d at 826. The *Johnson* court acknowledged uncertainty in determining the "undefined powers [that] attached to the same office in this country," and was only "certain that the Attorney General has been the chief law officer of the federal or the state governments with the duty of representing the sovereign, national or state in such capacity." *Id.*

I respectfully submit that absolutely nothing in the review of the common law duties of attorneys general supports the conclusion that the Attorney General of Kentucky has the legal authority, i.e., the standing, to assert the claims he now asserts against the Governor, the Finance Cabinet Secretary, the State Budget Director, and the Treasurer. Indeed, the majority relies upon the nebulous notion that "duty calls upon the Attorney General (and, thus, confers on him standing) to vindicate the public rights of the people of the Commonwealth."

The majority grants to the office of the Kentucky Attorney General virtual carte blanche to challenge any action of every officer of the executive branch of government, from the lowest county official to the office of the Governor, including the universities themselves, anytime the sitting attorney general deems it to be in the "public interest" to do so. Such unprecedented authority is an unwise departure from the common law and is totally unsubstantiated by any statutory directive.

61

The majority addresses a situation in which none of the aggrieved parties with a real interest to protect wish to do so. By cloaking the Attorney General with unbridled authority to assert in any action virtually any claim his office deems to be of "public interest," even when the affected parties choose not to do so, the majority sets a dangerous, disruptive precedent that is contrary to centuries of English and American common law tradition. The majority's ruling on standing paves the way for the resolution of an injusticiable issue, and it opens the gate for future adjudication of political issues best left to be resolved within the political branches or by litigation initiated by a party seeking redress for a direct and immediate injury.

WRIGHT, J., DISSENTING: I respectfully dissent. The majority does not reference the fact that the state university presidents met with the Governor and reached an agreement. The agreement was memorialized that same day in a letter signed by eight of the nine presidents. The letter stated that the presidents were "prepared to manage reductions in accord with the Governor's final offer of 2 percent in the current year if it is determined by the courts to be permissible . . . ." What the letter leaves unclear is what, exactly, was left to be determined as permissible by the courts. What's more, the universities did not file or join a case before the courts to determine what *was* permissible.

This language is ambiguous. On the one hand, the presidents could have been referring to whether they had the power to spend less funds than allocated. On the other, the presidents could have been referring to whether it was permissible for the Governor to reduce their already-allocated funds for the current fiscal year. The majority does address one of these issues by finding

62

that the universities are not required to spend every penny of the money provided them under the budget. But this still does not address the ambiguity of the letter.

The trial court relies on the letter's language two different times in its opinion and order—stating that "[i]n fact, as the Universities have come to an agreement with the Governor" in the first instance and referring to the agreement again later in its opinion and order. We do not set aside the trial court's findings of fact unless they are clearly erroneous. *Lawson v. Loid*, 896 S.W.2d 1, 3 (Ky. 1995). I do not believe that they are.

The Governor's second letter reducing the allotment for eight of the state universities referred to this agreement. The initial reduction of 4.5% was cut to 2% for the institutions whose presidents signed the letter. Kentucky State—the only state school which did not agree that it could reduce its spending—had its allotment completely restored. Clearly, the eight presidents who signed the letter agreed to the reduction and the one president who did not agree (the president of Kentucky State) received the full budgeted amount. There is no evidence of record as to whether the presidents had the authority to enter into such an agreement—and that is not at issue before this Court.

The universities did not join the lawsuit and neither party so much as deposed their representatives. The Attorney General does say in passing in his brief that the trial court erred referring to the agreement as a "fact" in its opinion and order. However, the Attorney General does not provide any evidence to support his contention that the trial court's finding was clearly erroneous and fails to further flesh out the argument.

63

On these facts, I would affirm the Franklin Circuit Court's grant of summary judgment, as the trial court found that there was an agreement between the universities and the Governor, thus rendering all other issues moot.

Venters, J., joins.

COUNSEL FOR COMMONWEALTH OF KENTUCKY, EX REL. ANDY BESHEAR, ATTORNEY GENERAL:

Andy Beshear, Attorney General of Kentucky
John Michael Brown, Deputy Attorney General
La Tasha Arnae Buckner, Executive Director Civil Division
Mitchel Terence Denham, Assistant Deputy Attorney General
Joseph Newberg
Office of the Attorney General
Capitol Building
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601

COUNSEL FOR COMMONWEALTH OF KENTUCKY OFFICE OF THE GOVERNOR, EX REL. MATTHEW BEVIN, IN HIS OFFICIAL CAPACITY AS GOVERNOR; COMMONWEALTH OF KENTUCKY FINANCE AND ADMINISTRATION CABINET, EX REL. WILLIAM M. LANDRUM, IN HIS OFFICIAL CAPACITY AS SECRETARY; COMMONWEALTH OF KENTUCKY OFFICE OF THE STATE BUDGET DIRECTOR, EX REL. JOHN CHILTON, IN HIS OFFICIAL CAPACITY AS STATE BUDGET DIRECTOR:

Michael T. Alexander
Mark Stephen Pitt
Stephen Chad Meredith
Office of the Governor
700 Capital Avenue, Suite 101
Frankfort, Kentucky 40601

COUNSEL FOR COMMONWEALTH OF KENTUCKY DEPARTMENT OF THE TREASURY, EX REL. ALLISON BALL, IN HER OFFICIAL CAPACITY AS TREASURER:

Noah Robert Friend
1050 U.S. Highway 127 South, Suite 100
Frankfort, Kentucky 40601


COUNSEL FOR JIM WAYNE, IN HIS OFFICIAL CAPACITY AS STATE REPRESENTATIVE; DARRYL OWENS, IN HIS OFFICIAL CAPACITY AS STATE REPRESENTATIVE; MARY LOU MARZIAN, IN HER OFFICIAL CAPACITY AS STATE REPRESENTATIVE:

Pierce Butler Whites
Speaker's Office
Senior Counsel
303 Capitol Annex
Frankfort, Kentucky 40601